**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**ST. JOSEPH DIVISION**

| | | |
|---|---|---|
| REBEKAH SALSBURY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 5:16-cv-06169-NKL |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Plaintiff Rebekah Salsbury appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits under Title II of the Social Security Act. The decision is affirmed.

**I.      Background**

Salsbury was born in 1978. She initially alleged she became disabled beginning 9/9/2009, but later amended her alleged onset date to 1/25/2013. The Administrative Law Judge held a hearing on 10/7/2015 and denied her application on 11/3/2015. The Appeals Council denied her request for review on 10/25/2016. In this appeal, Salsbury argues that the ALJ erred in finding that Salsbury's statements were not entirely credible. Salsbury also argues the ALJ failed to weigh and consider all opinion evidence of record by discounting the opinion of her treating physician, and by neglecting to evaluate the opinions of her chiropractor. Salsbury also argues the ALJ's RFC, specifically with regard to her mental impairments but also as a whole, is unsupported by any medical opinions. Finally, Salsbury argues the Commissioner failed to sustain her burden at Step 5 of the sequential analysis because the Vocational Expert included a job Salsbury could not perform in her testimony.

## A.  Medical history

Rebekah Salsbury has an extensive medical history, one which predates her alleged onset date by decades.  In September 2013, Salsbury visited Wendell Bronson, D.O., who remarked she had "[a] chronic complex collection of pain, poor sleep, fatigue, mood changes, inactivity, muscle deconditioning, weight changes and more pain since long before [he] met her, she says since 1993." Tr. 357. Her relevant medical history for the purpose of this order, however, begins at her alleged onset date, January 25, 2013.

In May 2013, Salsbury was examined by Angelia Martin, M.D. She was concerned about the possibility of hyperglycemia or diabetes because of some swelling and fluid retention. After an examination, Dr. Martin's diagnosis was fluid retention. Tr. 380. Salsbury returned to Dr. Martin in July 2013, complaining of migraines, joint pain, muscle spasms, dry eyes, and dry mouth. She had experienced sudden weight loss and weight gain, and feared she might have lupus or Sjogren's syndrome. Dr. Martin diagnosed Salsbury with fatigue, myalgia, arthralgia, dry eyes, and dry mouth. Tr. 376.

In July 2013, Salsbury visited Veronica Anwuri, M.D., her primary care physician, because she was having difficulty finding a rheumatologist. Salsbury had visited Dr. Anwuri several times over the past year, and Dr. Anwuri was familiar with Salsbury's symptoms. On previous occasions, Dr. Anwuri had diagnosed classic migraines, depressive disorder, carpal tunnel syndrome, myalgia and myositis, herpes zoster, gastroparesis, and esophageal reflux, and she had prescribed Hydroxyzine Pamoate, Tramadol HCI, Savella, Acetaminophen, Ibuprofen, and Promethazine. In July, Salsbury reported to Dr. Anwuri that she had dry eyes and a sore mouth, and requested to be checked for Sjogren's syndrome. Salsbury also reported wrist pain and swelling, and multiple trigger points that were tender upon exam. Dr. Anwuri diagnosed dry

eye syndrome, swelling of hands, edema, generalized muscle weakness, and myalgia and myositis. She also referred Salsbury to a rheumatologist.

In August 2013, Salsbury saw Melinda Pemberton, FNP. Ms. Pemberton's impressions were of fibromyalgia, abnormal serum ACE level, gastroparesis, dry eyes, anxiety, and depression. Tr. 363. Ms. Pemberton also observed significant hyperalgesia both above and below the waist, and underlying anxiety and depression. Tr. 364. She prescribed Savella and Tramadol, discontinued Flexeril, Lortab, Zyrtec, Ibuprofen, and Phenergan, and requested that Salsbury return to speak with Dr. Bronson, a rheumatologist, about her fibromyalgia. *Id.* Salsbury visited Dr. Bronson in September 2013, where he diagnosed her with fibromyalgia, anxiety, and depression. Tr. 357.

Salsbury returned to Dr. Anwuri after visiting the rheumatologist. Once again, Anwuri diagnosed fibromyalgia, but ruled out osteoarthritis, rheumatoid arthritis, sarcoid, and lupus. Other diagnoses at this visit included chronic fatigue syndrome, costochondritis, myalgia and myositis, generalized muscle weakness, DeQuervain's tenosynovitis, and postherpetic neuralgia. Tr. 411.

Throughout 2014 and 2015, Salsbury visited Dr. Anwuri on several occasions. Each time, Salsbury complained of increasing pain in her upper back and chest. Additionally, she reported anxiety and depression, intermittent swelling in her hands and feet, and fluctuating weight gain.

During this time period, Salsbury also visited Kimberly Findley, D.C., a chiropractor, for treatment of her back pain and fibromyalgia. Tr. 462-96. Dr. Findley diagnosed thoracic myofascitis and cervical torticollis, and chiropractic manipulative therapy was administered. Tr/ 474. Although treatment began in September 2012, Salsbury returned primarily at two week intervals throughout 2013 and 2014, until at least August 2015. In her reports, Findley often indicated Salsbury was "feeling much better" after treatments. Tr. 482-87.

In June 2015, Salsbury visited David Ewing, M.D. for evaluation of her migraines. Tr. 791. She reported pain that would last three to four days, and would occur on an average of twenty days a month. *Id.* Dr. Ewing's impression was that it was chronic daily headaches rather than migraines, perhaps caused by fibromyalgia, sleep disturbance, or a combination of the two. Tr. 794. Dr. Ewing prescribed Topamax, and at a follow up appointment in July 2015, Salsbury reported just one head ache in the time since her initial visit. Tr. 797.

**B.    Mental Health**

In June 2013, Salsbury visited Katherine Cole, D.O., a psychiatrist, for an initial evaluation. Salsbury reported being chronically depressed and struggling with not working. Tr. 432. She also complained of low energy, low motivation, and anhedonia. *Id.* She frequently had panic attacks triggered by stress, and a history of abuse from her boyfriend and ex-husband. Dr. Cole diagnosed major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and panic disorder without agoraphobia, and prescribed BuSpar, Depakote, and Wellbutrin. Tr. 435.

Salsbury returned to Dr. Cole in July 2013, reporting vertigo for the past two-three weeks. At this appointment, Salsbury appeared to be hypomanic with racing thoughts and rapid speech. Tr. 428. One month later, in August 2013, Salsbury visited Dr. Cole once again. Tr. 418. This time she was doing a little better, and her mood was stable. *Id.* She was anxious due to being overwhelmed with all of her diagnoses, but she was not depressed. *Id.* Dr. Cole increased Salsbury's BuSpar prescription. Tr. 421.

Salsbury visited Dr. Cole seven more times between September 2013 and March 2015. At each visit, Dr. Cole diagnosed major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, panic disorder without agoraphobia, and cognitive disorder likely related to chronic pain and fatigue. Dr. Cole also prescribed BuSpar, Wellbutrin, Depakote, and

Adderall, though she increased and decreased the dosages as necessary.

## C.    Expert opinions

Kenneth Smith, M.D., a State agency medical consultant, opined that Salsbury could lift and/or carry 25 pounds occasionally, 10 pounds frequently; sit six hours; stand and/or walk two hours; occasionally climb ladders, ropes, scaffolds, ramps, and stairs; occasionally balance, stoop, kneel, crouch, and crawl. Tr. 79-80. The ALJ gave this opinion little weight. Tr. 23.

Linda Skolnick, Psy.D., a non-examining, non-treating State agency psychological consultant, opined that Salsbury had mild restriction of activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace. Tr. 77-82. She also opined Salsbury could not perform complex tasks or tolerate work that required contact with the public. Dr. Skolnick also opined, however, that Salsbury retained the capacity to understand, remember, and carry out at least simple to moderately complex instructions and tasks. She also opined that Salsbury could interact socially and adapt in a setting that did not require close interpersonal interaction with the public. The ALJ gave the opinion great weight because Dr. Skolnick provided support for it, it is consistent with the claimant's mental health treatment records, and it considers the claimant's improvement with the use of medication. Tr. 24.

Veronica Anwuri, M.D., Salsbury's treating physician, completed two Physician's Residual Functional Capacity Assessments with regard to Salsbury's physical limitations. In the first, May 2014, she opined Salsbury could lift ten pounds frequently and twenty-five pounds occasionally. Tr. 394. She indicated Salsbury could sit less than one hour a day and stand or walk less than two hours a day, but would need to lie down or recline more than four hours a day. *Id.* Dr. Anwuri checked boxes indicating Salsbury could use her hands for repetitive simple grasping, but could not perform other repetitive actions with her hands or arms. *Id.* She checked

boxes indicating Salsbury could occasionally perform most postural activities, but could never squat. *Id.* at 395. Dr. Anwuri checked boxes indicating Salsbury's degree of pain and fatigue were debilitating, and indicated that Salsbury would miss work more than three times a month due to her impairments. *Id.*

In the second Physician's Residual Functional Capacity form, dated September 2015, Dr. Anwuri opined that Salsbury could sit up to five hours a day, though only for one hour at a time. Tr. 820. She again checked boxes indicating Salsbury could use her hands for repetitive simple grasping, but could not perform other repetitive actions with her hands or arms. *Id.* She indicated Salsbury could occasionally perform most postural activities, but could never squat or stoop. She also checked boxes indicating Salsbury could not work around unprotected heights, moving machinery, temperature changes, dust, fumes, or drive. *Id.* at 821. Again, Dr. Anwuri checked boxes indicating Salsbury's fatigue and pain woud be debilitating. *Id.* at 822. She also indicated Salsbury had poor or no ability to deal with the stress of a low stress job, and would miss work three times each month. *Id.*

**D.      The hearing before the ALJ**

Salsbury testified that she was thirty-seven years old and holds an MBA in Human Resource Management, but had not worked since her alleged onset date of January 25, 2013. Tr. 39-40. Salsbury stated that extreme pain, extreme fatigue, cognitive impairment, brain fog, and memory problems prevent her from working. She reported pain everywhere, although she stated it was most significant in her back, legs, and hips. Tr. 40.

Salsbury testified that she could not sit or have anything touching her back, and that it also hurt her to stand up or lean over. Tr. 41. Salsbury reported that her pain continued to worsen, and that she often experienced numbness and pain in her fingers, toes, and feet. She estimated she could sit for up to two hours, or walk for up to one hour, but neither activity would

be painless. *Id.* Salsbury also reported balance issues, and stated that she needed a cane to help her walk. Tr. 42. In addition to the physical pain, Salsbury also reported extreme fatigue. She reported taking one to two naps every day, and even occasionally falling asleep in the middle of eating. *Id.*

Stella Doering testified as a vocational expert at the administrative hearing. Tr. 49. The ALJ posed to the her three hypothetical questions, which assumed an individual of Salsbury's age, education, and past work experience. The first hypothetical involved an individual restricted to lifting twenty pounds occasionally, ten pounds frequently, standing and walking two hours in an eight-hour workday, sitting six hours in an eight-hour workday, and having a sit/stand option alternate every sixty minutes. The individual could not climb ladders, ropes, or scaffolds, though could occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl. The individual could never have a job involving vibrating machinery, hazards, or heights. The individual needed to avoid frequent exposure to extreme cold, wetness, and vibration. The individual must completely avoid any flashing lights, and the noise level is limited to three—a moderate level like a business office. Psychologically, the individual would be limited to simple, repetitive, routine tasks, and occasional interactions with supervisors, co-workers, and the public. The vocational expert testified that such an individual could perform the sedentary positions of document preparer, addressing clerk, and weight tester. Tr. 51.

The second hypothetical included the same vocational background and mental restrictions, but with new physical limitations. Tr. 51-52. This time, the individual could lift a maximum of twenty-five pounds one time, sit up for five hours in an eight-hour workday, and stand and walk two hours in an eight-hour workday. She could occasionally bend, crouch, crawl, kneel, climb, and reach, but she could never squat or stoop. The vocational expert testified there would be no full-time competitive work available. Tr. 52.

Finally, the third hypothetical returned to the same limitations as the first. *Id.* This time, however, it added an additional limitation where the individual is off task for up to one hour in an eight-hour workday, excluding lunches and two breaks. The vocational expert testified this would generally not be compatible with the ability to perform full-time, competitive work. *Id.*

E.      **The Decision**

The ALJ determined Salsbury suffered the following severe impairments: depression, anxiety disorder, a history of gastroparesis, arthralgias, fibromyalgia, chronic fatigue, and migraines. The ALJ found that Salsbury has the residual functional capacity:

> [T]o lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk two hours in an eight-hour workday; and sit six hours in an eight hour workday. She requires a sit/stand option every 60 minutes. She can occasionally climb ramps and stairs, balance, stoop, kneel, and crawl, but should never climb ladders, ropes, or scaffolds. She is further limited to avoiding frequent exposure to extreme cold, wetness, vibration, and avoiding all exposure to flashing lights, and hazards, such as machinery and heights. Noise level is limited to level 3, moderate, like a business office. Additionally, the claimant is limited to simple, repetitive, and routine tasks with occasional interaction with supervisors, co-workers, and the public.

Tr. 18. Relying on vocational expert testimony, the ALJ concluded Salsbury's impairments would not preclude her from performing work that exists in significant numbers in the national economy. Tr. 25.

II.     **Discussion**

Salsbury argues that the ALJ erred in finding that Salsbury's statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely credible. Salsbury also argues the ALJ failed to weigh and consider all opinion evidence of record, by neglecting to evaluate the opinions of her chiropractor, and by discounting the opinion of her treating physician, Dr. Anwuri. Salsbury also contends the ALJ's RFC, specifically with regard to her

mental impairments but also as a whole, is unsupported by any medical opinions. Finally, Salsbury argues the Commissioner failed to sustain her burden at Step 5 of the sequential analysis because the Vocational Expert included a job Salsbury could not perform in her testimony.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Id*. The Court must consider evidence that both supports and detracts from the Commissioner's decision but cannot reverse the decision because substantial evidence also exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

### A.      The Credibility Determination

Salsbury argues that the RFC is unsupported by the ALJ's credibility determination. She contends that the ALJ's sole reason for finding Salsbury not entirely credible was because of the lack of objective medical evidence to support a disability finding. Doc. 10, p 25. However, the ALJ's decision that Salsbury's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible was not based merely on an absence of objective support, but rather it was affirmatively supported by the record as a whole.

"An ALJ may not disregard subjective complaints merely because there is no evidence to support the complaints, but may disbelieve subjective reports because of inherent inconsistencies

or other circumstances." *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007). "Subjective complaints may be discounted if the evidence as a whole is inconsistent with" them. *Cox v. Barnart*, 471 F.3d 902, 907 (8th Cir. 2006). Thus, to analyze subjective complaints of pain, an ALJ considers the entire record, including the medical records; statements from the plaintiff and third parties; the plaintiff's daily activities; the duration, frequency, and intensity of pain; the dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; and functional restrictions. *See* 20 C.F.R. §§ 404.1529 and 416.929; *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

Although in the present case the ALJ did not specifically address the *Polaski* factors, that omission alone does not require reversal. "[A]n ALJ need not explicitly discuss each *Polaski* factor . . . . It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (quotations omitted). Here, the ALJ acknowledged both the controlling regulations and relevant Social Security Rules, which include the *Polaski* factors. Tr. 18. Additionally, he stated that he considered both objective medical evidence and other evidence, based on those requirements. Tr. 18. The ALJ then performed a detailed review of Salsbury's medical history over the relevant period, and identified inconsistencies and contradicting treatment notes. Tr. 19-24.

For example, in June 2013, Salsbury's mental status exam showed she was fully oriented with intact memory, normal attention span, normal speech, and intact judgment and insight. Tr. 19. By June 2014, Salsbury reported doing better with depression, and her mood was "euthymitc, happy, pleased, but anxious; her affect was full and congruent with her mood." Tr. 20. Her attention and concentration were "grossly intact," her judgment and memory were intact, and her thoughts were linear, logical, and goal-directed." Tr. 20. With regard to physical impairments, Salsbury's March 2014 treatment records showed a normal gait, balance, strength and tone, and

no abnormal or involuntary movements. Tr 21. In June 2014, Salsbury's physical exam again showed normal balance, strength, tone, gait, and no abnormal movements. Tr. 22. In June 2015, Salsbury's physical exam "showed no evidence of asymmetry of strength," and she was able to rise from her chair without difficulty. Tr. 22. She was able to stand, walk, and turn without a problem, and had a normal gait and could heel and toe walk. Tr. 22. Salsbury's treatment notes were inherently inconsistent with her allegations of total disability.

Furthermore, the ALJ observed that Salsbury's impairments improved with treatment and medicine. He noted, "overall [Salsbury's] pain appears to be somewhat controlled by her medication when she is taking it as prescribed." Tr. 23. More specifically, he observed that "taking Wellbutrin greatly helped treat [Salsbury's] depression," and Salsbury was often "noted to improve and respond well to [chiropractic] treatment." Tr. 20. The ALJ also observed that some of Salsbury's symptoms were likely a result of failing to follow her doctors' instructions. Tr. 22 ("[Salsbury] continued to eat dairy and gluten daily, which she was instructed to avoid due to gastroparesis."). "'Impairments that are controllable or amenable to treatment do not support a finding of total disability.'" *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 53, 855 (8th Cir. 2003) (quoting *Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999).

The ALJ observed that objective medical evidence affirmatively contradicted Salsbury's allegations, and did not simply fail to support it. "[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances." *Crawford v. Colving*, 809 F.3d 404, 410 (8th Cir. 2015) (finding that based on several discrepancies between the medical records and the claimant's testimony, the ALJ correctly found allegations about the severity of his disability and the resulting impact was not credible). A claimant's subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's subjective testimony. *Cox v. barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). The ALJ

need not give Salsbury's allegations about her symptoms great weight when they are inconsistent with the objective medical evidence. *Id.* Here, the ALJ appropriately determined that the objective clinical and diagnostic evidence contradicts Salsbury's allegations. Tr. 23. His decision was based on affirmative, objective evidence, rather than merely a lack of objective evidence to support it, as Salsbury contends, and therefore his findings as to Salsbury's credibility do not constitute error.

### B.     The Opinion Evidence

Salsbury contends that the ALJ did not properly weigh the opinions of Dr. Anwuri, and that the ALJ failed to consider the opinion of her chiropractor, Kimberley Findley, D.C. all together.

### 1.     Dr. Anwuri

Salsbury argues the ALJ erred in discounting Dr. Anwuri's opinion. The ALJ gave Dr. Anwuri's opinions little weight at the fourth step in the sequential evaluation process. 20 C.F.R. § 416.920(e). An ALJ is to consider the medical opinions together with the rest of the relevant evidence in determining disability, 20 C.F.R. § 416.927, and need not base his decision on the opinion of any one particular physician. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). When evaluating medical opinion evidence, the ALJ considers factors such as:

- How long the source has known, and how frequently the source has seen, the claimant;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion; and
- Whether the source has a specialty related to the claimant's impairments.

*See* 20 C.F.R. § 416.927(c); Social Security Ruling 06-03p. An ALJ generally gives a treating physician's opinion more weight than opinions of other medical sources, but the ALJ must

consider whether the opinion is consistent with the record as a whole. 20 C.F.R. § 416.927(c-d). Ultimately, it is up to the ALJ to determine the weight each opinion is due. *See Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008). Moreover, the ALJ remains the ultimate arbiter of a claimant's RFC. 20 C.F.R. § 416.927(d)(2).

Dr. Anwuri completed two Physician's Residual Functional Capacity forms—one in May 2014, and another in September 2015. In each, Dr. Anwuri opined Salsbury had significant physical impairments, that her pain and fatigue was debilitating, and that she had poor or no ability to deal with the stress of a low stress job. The ALJ considered Dr. Anwuri's opinions, but gave them little weight because they are not supported by the objective findings and diagnostic evidence in the record. Tr. 23. Additionally, the ALJ observed that Dr. Anwuri is not a mental health professional, and therefore her opinion that Salsbury could not handle even "low stress" work was outside her area of expertise. Tr. 24. Finally, the ALJ determined that certain evidence from Dr. Anwuri should receive little weight because it referenced a period prior to Salsbury's alleged onset date.

Although the ALJ did not explicitly analyze Dr. Anwuri's opinions within the framework of a medical opinion, his decision sufficiently took into account its factors, and there is substantial evidence to support his treatment of Dr. Anwuri's opinion.

### 2.    Dr. Findley

Salsbury argues that the ALJ's silence with regard to Dr. Findley's opinions constitutes reversible error. Salsbury contends that 20 C.F.R. § 404.1527 requires the ALJ to always consider medical opinions, and include in his decision an explanation of the weight given to them. Doc. 10, p. 20. She also argues, "where the court is unsure what weight, if any, is afforded a physician's opinion, remand is required." *Id.* (citing *McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008)).

In August 2013, Dr. Findley completed a Return to Work and Work Limitation Disability Form, where she ultimately opined Salsbury was "unable to work outside the home due to illness." Tr. 481. She further opined Salsbury could lift no more than four pounds for fifteen minutes, twice daily, that reaching or working above the shoulder should be limited to fifteen minutes daily, walking and standing limited to fifteen minutes twice a day, and sitting limited to fifteen minutes five times a day. *Id.* Dr. Findley also opined Salsbury could not stoop, kneel, bend repeatedly, climb, operate a motor vehicle, or operate a crane, tractor, or similar vehicle. She concluded Salsbury was totally disabled due to arthritis, chronic fatigue, fibromyalgia, and sarcoidosis. *Id.*

Salsbury cites to *McCadney v. Astrue* for the proposition that an ALJ's failure to explicitly state the weight afforded a physician's opinion requires remand. 519 F.3d 764 (8th Cir. 2008). However, *McCadney* is distinguishable from the present case. In *McCadney*, the ALJ failed to mention an entire diagnosis—dementia. *Id.* Moreover, the claimant's mental status was likely case determinative. When posed with two hyopotheticals, one including the possibility of mental impairments, including dementia, and one without them, the vocational expert concluded that without any mental issues the individual could find work in the national economy, but there would be no work if he did have significant mental impairments. *Id.* at 766. Therefore the absence of any mention of the claimant's dementia diagnosis was classified as a "most glaring omission." *Id.* at 767.

Conversely, the present case is similar to *Wildman*, which stated, "although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting "*Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). Moreover, "an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* In *Wildman*, the Eighth Circuit found that

given an ALJ's specific references to findings set forth in one doctor's notes, it was "highly unlikely that the ALJ did not consider and reject [them]." *Id.*

Here, the ALJ similarly referenced Dr. Findley. Tr. 20. While the ALJ did not explicitly reference the form Dr. Findley completed for Salsbury, he did reference Dr. Findley's treatment notes. *Id.* Specifically, the ALJ noted that Dr. Findley observed minimal tenderness, and that Salsbury improved and responded well to treatment. *Id.* Therefore, it is unlikely that the ALJ did not consider Dr. Findley's opinion. That he did not explicitly state the amount of weight he afforded the opinion does not require remand.

### C.     Support for the RFC

Salsbury also argues that the RFC determination as a whole, as well as specifically regarding her mental impairments, lacks support from substantial evidence on the whole record. This argument fails.

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of her limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217

(8th Cir. 2001).

### 1.      Salsbury's Mental Impairments

Salsbury argues that the record does not provide substantial evidence to support the ALJ's findings with regard to Salsbury's mental impairments. In determining Salsbury's RFC regarding her mental impairments, the ALJ relied on the opinions of Dr. Skolnick. Salsbury contends that Dr. Skolnick's opinions are not substantial evidence because she did not examine or treat Salsbury, and because she issued her opinion a year before the ALJ review. This, Salsbury argues, means Dr. Skolnick was without the benefit of more than a year's worth of medical records. Salsbury also argues the ALJ erroneously failed to identify the weight accorded to the global assessment of functioning (GAF) scores. Finally, Salsbury argues the ALJ should have obtained another opinion regarding her mental impairment from a treating physician.

The ALJ accorded Dr. Skolnick's opinion great weight because it was consistent with the overall record. Tr. 24. Dr. Skolnick opined that Salsbury's mental impairments caused mild restriction of activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace. Tr. 17. She opined Salsbury could not perform complex tasks or work that required contact with the public. Tr. 91. The ALJ also observed that Dr. Skolnick used the record to support her conclusions. Tr. 17. For example, Dr. Skolnick noted Salsbury cares for her young son and school-aged daughter, and in doing so prepares meals, bathes them, and does household chores. *Id.*

Salsbury argues the ALJ erred in relying on Dr. Skolnick's opinion because she did not examine or treat Salsbury. There is no prohibition against relying on opinions from state agency psychologists, however, when the opinions are supported by the record. *See Masterson*

*v. Barnhart*, 363 F.3d 731, 737-39 (8th Cir. 2004) (holding that the ALJ properly relied on the assessments of a nonexamining physician, and not claimant's treating physicians, in determining the RFC at step four). Therefore, while it is true, Dr. Skolnick was a non-examining, non-treating state Agency consultant, the ALJ did not err in relying on her opinion.

Salsbury further contends that because a year passed between Dr. Skolnick's opinion and the ALJ decision, Dr. Skolnick issued her opinion without a complete set of records. However, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Therefore, it does not constitute a reversible error that more than a year passed between Dr. Skolnick issuing her opinion and the ALJ hearing and decision.

Next, Salsbury argues the ALJ erroneously failed to identify how he weighed GAF scores. The Eighth Circuit, citing the DSM–IV, has previously stated that GAF scores below 50 are an indication of serious symptoms and a serious limitation on a claimant's ability to perform basic life tasks. *See Pate–Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009). However, the DSM–V, released in 2013 and replacing the DSM–IV cited by the Eighth Circuit, no longer uses GAF scores to rate an individual's level of functioning because of "its conceptual lack of clarity" and "questionable psychometrics in routine practice." See *Rayford v. Shinseki*, 2013 WL 3153981, at *1 n. 2 (Vet. App. 2013) (quoting the DSM–V). Further, other evidence in the record is inconsistent with a GAF score indicating serious limitations on the ability to function. *See Wright v. Astrue*, 489 Fed. Appx. 147, 149 (8th Cir.2012) (failure to discuss GAF scores did not require reversal given ALJ's comprehensive analysis of the

medical evidence, the infrequency of the GAF scores, the range of the GAF scores, the claimant's conflicting activities, and the conflicting medical evidence).

Finally, Salsbury argues the ALJ should have ordered a consultative examination. However, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Barrett v. Shalala*, 38 F.3d 1019 (8th Cir. 1994). Salsbury presented the ALJ with detailed records of her past medical history. The ALJ had sufficient medical evidence to determine Salsbury's RFC regarding mental impairments.

### 2.    As a Whole

Salsbury argues that by discounting the opinions of both Dr. Anwuri and Dr. Smith, the RFC is not supported by substantial evidence. However, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quotation omitted).

The ALJ considered all of Salsbury's symptoms, and the extent to which they were supported by the medical evidence in the record. *See* 20 C.F.R. § 416.929 ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."). First, as discussed above, the ALJ concluded that Salsbury's statements regarding her limitations were less than credible. The ALJ recognized that her medically determinable impairments could reasonably be expected to cause some of the symptoms; however, her statements concerning the intensity, persistence, and limiting effects were not entirely credible. Tr. 19.

The ALJ expressly stated he based the RFC finding on Salsbury's impairments. Tr. 19. In the decision, the ALJ discussed and considered Salsbury's back pain and fibromyalgia, as well as

Salsbury's mental impairments such as depression and anxiety. The ALJ determined that Salsbury had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently. This finding is consistent with both Dr. Anwuri and Dr. Smith's opinions. Additionally, Salsbury testified that she could lift up to 20 pounds. Tr. 46. The ALJ found Salsbury could stand/walk two hours in an eight-hour workday; and sit six hours in an eight hour workday. She requires a sit/stand option every 60 minutes, and she can occasionally climb ramps and stairs. This is all consistent with Dr. Smith's opinion. Tr. 93. The ALJ also determined Salsbury can occasionally balance, stoop, kneel, crouch, and crawl. This is consistent with both Dr. Anwuri and Dr. Smith's opinions. Due to Salsbury's back pain and fibromyalgia symptoms, the ALJ found she should never climb ladders, ropes, or scaffolds, and is further limited to avoiding frequent exposure to extreme cold, wetness, and vibration. Salsbury's noise level is limited to level 3, moderate, like a business office. Finally, consistent with Dr. Skolnick's opinion, the claimant is limited to simple, repetitive and routine tasks with occasional interaction with supervisors, co-workers, and the public. Tr. 18.

The ALJ is not required to determine an RFC based solely on one specific medical opinion. *See Martise*, 641 F.3d at 927. Rather, he is allowed to consider eight different types of evidence, of which medical opinions are one category. Ultimately, it is up to the ALJ to determine the weight each opinion is due. *See Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008). Moreover, the ALJ remains the ultimate arbiter of a claimant's RFC. 20 C.F.R. § 416.927(d)(2).

Salsbury also argues the ALJ's failure to consider statements from her parents suggests the ALJ's decision was not based on substantial evidence. Salsbury's mother and father each completed a Third Party Function Report supporting their daughter's application for disability benefits. The reports are substantially similar to Salsbury's allegations, and largely echo her

testimony. Where an ALJ does not expressly address a third party statement in his decision, and the Court cannot determine whether he even considered the statements at all, it nonetheless does not require remand if "it is evident that most of the third party's testimony concerning the claimant's capabilities was discredited by the same evidence that discredits the claimant's own testimony concerning his limitations." *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011).

The third party reports from Salsbury's parents support Salsbury's allegations, and therefore are inconsistent with the record for the same reasons as Salsbury's testimony. The ALJ specifically determined, "the objective clinical and diagnostic evidence does not support the claimant's allegations." Tr. 23. As the third party opinions of Salsbury's parents are similar to her own, the objective clinical and diagnostic evidence would not support them. As a result, the ALJ's failure to address the third party reports from Salsbury's mother and father does not constitute reversible error.

Salsbury disagrees with the ALJ's decision, but has not demonstrated prejudicial error. *Byes v. Astrue,* 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred."); and *Lacroix v. Barnhart*, 465 F.3d 881, 888-89 (8th Cir. 2006) (finding that the claimant failed to establish the prejudice necessary for a reversal). The ALJ's decision was supported by substantial evidence on the whole record, including some medical evidence. A court may not reverse an ALJ's decision that is supported by substantial evidence, even if the court would have reached a different conclusion, or merely because substantial evidence also supports the opposite outcome. *Kluesner,* 607 F.3d at 536, and *Culbertson*, 30 F.3d at 939. It was Salsbury's burden to prove she had a more restrictive RFC and she failed to bear it.

### D.    Finding at Step 5

Finally, Salsbury argues reversal is necessary because the Commissioner did not sustain her burden at Step 5. Salsbury argues that the vocational expert's testimony about one of the three jobs identified, document preparer, was inconsistent with the Dictionary of Occupational Titles (DOT). Specifically, she argues that her RFC is limited to repetitive work, but the document preparer job as described in the DOT is not repetitive. Suter's argument does not merit reversal.

The vocational expert, Stella Doering, testified that a hypothetical individual with Salsbury's RFC, including a limitation of repetitive work, could perform the jobs of document preparer, addressing clerk, and weight tester. The ALJ specifically asked Doering at the beginning of her examination whether she understood that if she gave an opinion conflicting with information in the Dictionary of Occupational Titles, she needed to advise the ALJ of the conflict and the basis of her opinion. Doering stated she understood, and did not point out any differences during her testimony. See Tr. 48-53. Doering testified that there were 114,000 document preparer jobs in the national economy, 45,000 addressing clerk jobs, and 44,0000 weight tester jobs nationally. Tr. 51.

Assuming that the document preparer job is inconsistent with the DOT, as Salsbury argues, the VE identified two other jobs. Salsbury suggests, however, that the VE's inclusion of the document preparer job shows the VE's testimony was unreliable, which the ALJ did not realize, and that the error therefore cannot be considered harmless. But the Eigth Circuit has expressly held that a VE's "mistaken recommendation" can be harmless error where the VE has recommended other work that a claimant can perform with her RFC. *See Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014). Furthermore, nothing suggests that Doering failed to identify another job consistent with the DOT. For example, the addressing clerk job (DOT #209.857-010) involves addressing by hand or typewriter, envelopes, cards, advertising literature, packages, and

similar items for mailing. In other words, it is repetitive. Moreover, nothing in the record suggests that the ALJ would have decided differently had the ALJ realized the document preparer job was not repetitive. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred.").

Salsbury's argument concerning the Step 5 findings therefore fails.

**III. Conclusion**

The Commissioner's decision is affirmed.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  October 3, 2017
Jefferson City, Missouri